OPINION OF THE COURT
John M. Hunt, J.
I
Respondent, who is charged with committing acts which, were she an adult, would constitute the crimes of prostitution, resisting arrest, obstructing governmental administration in the second degree, and false personation, has moved pursuant to Family Court Act § 311.4 (3) for an order directing the substitution of a petition alleging that she is a person in need of supervision (PINS)[1] for the petition alleging that she is a juvenile delinquent.[2]
The juvenile delinquency petition filed by the presentment agency on May 19, 2010 alleges that on May 18, 2010 in Queens County, the respondent, Bobby E (born July 17, 1994), offered to engage in sexual conduct with an undercover police officer in exchange for payment, in violation of Penal Law § 230.00. The petition further alleges that respondent resisted arrest by fleeing from police officers who intended to take her into custody for committing the crime of prostitution, and that she obstructed governmental administration by physically resisting arrest and *961 by refusing to follow the directives of police officers after she had been taken into custody.
With respect to the prostitution charge, the supporting deposition of an undercover police officer, identified as “Undercover Officer CO 147,” states in pertinent part that, at approximately 6:50 a.m. in the vicinity of 111th Avenue and Sutphin Boulevard, Jamaica, Queens County, “a known prostitution location,” the respondent
“said to me in sum and substance, ‘what do you want?’ I replied, in sum and substance, ‘a quickie’, which I intended to mean oral sex, and made a hand gesture [which] indicated oral sex’. The respondent then said to me, in sum and substance, ‘you want a blowjob?’, which I understood to mean oral sex. I asked the respondent how much for the blowjob and she replied, in sum and substance, ‘fifty dollars’. The respondent then got inside of my vehicle.”
Respondent appeared before the court with the law guardian appointed to represent her for the initial appearance upon the petition on May 19, 2009 (see Family Ct Act §§ 320.1, 320.5). Theresa Slater, a foster care supervisor employed by New York Foundling Hospital, an authorized agency as defined by Social Services Law § 371 (10), was also present at the initial appearance. New York Foundling presently has joint legal guardianship of the respondent along with the New York City Administration for Children’s Services as a result of unrelated proceedings terminating the parental rights of respondent’s biological parents (see Social Services Law § 384-b; Family Ct Act § 614), and the presentment agency appeared by an assistant corporation counsel.
In requesting that the court order the respondent detained in a secure setting, the Assistant Corporation Counsel noted that at the time respondent had been arrested for the underlying crime, she was absent without permission from New York Foundling’s custody, that she had been regularly absent without permission from the agency or her foster parent from January until August 2009, and that her whereabouts had been unknown during that time. According to information provided to the presentment agency, in addition to running away, the respondent had been engaging in acts of prostitution since she has been 12 years old, she has a child of her own who had to be removed from her care by the Administration for Children’s Services, which had thereafter commenced child protective proceedings *962 against respondent on behalf of the child. The law guardian moved for substitution of a PINS petition for the juvenile delinquency petition, citing Family Court Act § 311.4 (3).
Information concerning respondent’s background was obtained by means of questions put to Ms. Slater who has supervised respondent’s foster care with New York Foundling since 2007. According to Ms. Slater, respondent had been referred to the “GEMS” program sometime in 2009. GEMS is the Girls Education and Mentoring Services, which is a social services program offering counseling to young women who have been sexually exploited. At some point, approximately “October or November” of 2009, respondent disappeared from the GEMS facility and she subsequently “fabricated a kidnapping, stating that kids kidnapped her from GEMS:” According to Slater, respondent “later recanted, stating it was made up and she was not kid-napped. She went off and spent some time with a young man.” According to Ms. Slater, respondent had been referred to the GEMS program by New York Foundling because “Bobby has a history of prostitution.” Ms. Slater recalled that in 2007 respondent’s foster care case had come under her supervision and that respondent, who was then just 12 years old, was already “introduced to the lifestyle” and had been working with adult pimps. Respondent gave birth to her own daughter in October 2009 and she and the infant were initially placed in a “mother/daughter” foster home in Brooklyn. Since then, the infant has been removed from respondent’s custody and placed into a different foster home. Child protective proceedings have been commenced on behalf of the infant and against the respondent by the Administration for Children’s Services.
In arguing for the substitution of a PINS petition, respondent’s law guardian contended that respondent is a victim of sexual exploitation and is entitled to the relief requested. The law guardian observed that respondent has no prior juvenile delinquency adjudications for offenses based upon acts defined by article 230 of the Penal Law, nor does she have any PINS history in the Family Court. In addition, the respondent is herself a child placed in foster care as the result of child protective proceedings and termination of parental rights proceedings which had been previously brought against her biological parents. The presentment agency argued against the requested substitution on the ground that the respondent has failed to express a genuine current willingness to accept and comply with services. As noted by the Assistant Corporation Counsel, *963 respondent had already been offered services by New York Foundling, including a referral to the GEMS program, but she has a history of running away from her foster home and the GEMS program facility. Respondent’s attorney contended that she is currently willing to accept services as indicated, in part, by her planned cooperation with the District Attorney’s office in its ongoing investigation of prostitution in Queens County. Indeed, the law guardian observed that her client has been assisting Assistant District Attorney Jessica Melton “to prosecute the pimp that has been involved in this young lady’s life.” Respondent had received a subpoena to appear in Criminal Court on June 7 or June 8, 2010, and it was her intention to appear and cooperate. As observed by the law guardian, respondent’s “cooperation with the Assistant District Attorney on that . . . is proof, for lack of a better word, that she is willing to cooperate with any services that are put in place for her.”
Based upon the information adduced at the initial appearance, the court determined that there was a serious risk that respondent would commit further criminal acts or acts of juvenile delinquency were she to be released to her lawful custodian pending further proceedings upon the petition. The court also determined that based upon respondent’s history, there was a substantial probability that she would not return to court for further proceedings were she to be released (Family Ct Act § 320.5 [3] [a], [b]), as well as that the continuation of respondent in her present home would be contrary to her best interests, and that reasonable efforts had been made prior to the date of the initial appearance to prevent or eliminate the need for removal of the respondent from her home. The court reserved decision on the respondent’s substitution application as it was unclear whether this particular case was one in which substitution under Family Court Act § 311.4 (3) was appropriate. The court then proceeded to enter an order in accordance with Family Court Act § 320.5 directing that the respondent be detained in the custody of the New York City Department of Juvenile Justice pending further proceedings upon the petition. A probable cause hearing was scheduled for May 21, 2010 (see Family Ct Act § 325.1).
The probable cause hearing was conducted on May 21, 2010. The presentment agency called New York City Police Detective Ivy Dror as its witness. For the past three years Detective Dror has been assigned to the Police Department’s Vice Enforcement Division and she is assigned to Queens County. In that assign *964 ment, the detective “investigate^] cases regarding prostitution, gambling and narcotics and [goes] out to conduct enforcement.” At approximately 6:55 a.m., on.May 18, 2010, Detective Dror and other officers from the Vice Unit, including Detective Ryan Henry and Detective Rahim, were on duty in street clothes and they were in the vicinity of 114-01 Sutphin Boulevard, “a known prostitution location” for the purpose of “conducting enforcement regarding prostitution on Sutphin Boulevard.” According to Detective Dror, at that time she and Detective Rahim were in the unmarked police van when they received a radio transmission from another officer assigned to their detail advising that a suspect had agreed to engage in sexual activity with an undercover police officer in exchange for money.
After receiving the radio transmission, Detective Dror observed the suspect exit the unmarked police vehicle in which the undercover police officer had transacted business with the respondent. Detective Dror then proceeded to exit the police van with her shield displayed with the intent of placing respondent under arrest for prostitution. When Dror attempted to place respondent under arrest “she ran away.” Dror yelled out to respondent more than once “police, don’t move!” but respondent continued to flee. Detective Dror gave chase after the respondent for “a few blocks” and when she finally caught up to the respondent “she tried to grab her hand and [respondent] tried to pull away from me.” At about that time, another police vehicle driven by Detective Henry pulled up to the location where Dror was attempting to subdue the respondent. With the assistance of Henry, the two detectives were finally able to subdue and arrest respondent, who had been “screaming, flailing her arms, and trying to get away” from the officers.
The detectives placed the handcuffed respondent into a police van in order to be taken to a “prisoner van” for transportation to the precinct. Detective Dror recalls that when the van arrived at the location where the “prisoner van” was located, respondent “refused” to exit the first van, although asked several times by the officers, respondent continued “screaming and yelling.” Two police officers were required to physically remove the respondent from the police van for transfer to the prisoner van. After respondent had been placed into the prisoner van, she eventually “calmed down” and Detective Dror sought to obtain pedigree information from her. According to Dror, the respondent told her that her name is “Aniya C.,” that she was born “in March 1990” and that she is “eighteen years old.” This information was later discovered to be false.
*965 At the conclusion of the hearing, the court concluded that the presentment agency had established probable cause to believe that the respondent committed all three of the charges in the petition (People v Bigelow, 66 NY2d 417, 423 [1985]; People v Hicks, 68 NY2d 234, 238 [1986]; People v Yancy, 86 NY2d 239, 245 [1995]; People v Maldonado, 86 NY2d 631, 635 [1995]). In determining that there was reasonable cause to believe that a crime was committed and that respondent is the person who committed the crime, the court found that Detective Dror was entitled to rely upon police communications and information transmitted by other police officers who were working on the undercover operation with her (People v Rosario, 78 NY2d 583, 588-589 [1991]; People v Ramirez-Portoreal, 88 NY2d 99, 113 [1996]; People v Ketcham, 93 NY2d 416, 419-420 [1999]).
The court again proceeded to consider respondent’s current custodial status as well as the application to substitute a PINS petition for the juvenile delinquency petition (Family Ct Act § 325.3 [3]). The Assistant Corporation Counsel informed the court that respondent had also been arrested for an unrelated act of loitering for the purpose of engaging in prostitution on February 6, 2010. At the time of that arrest, respondent told the police that her name was “Rebecca B.” and that she was 18 years old. Respondent was therefore arrested as an adult and she appeared in the Criminal Court prior to being released from custody when an assistant district attorney confirmed that respondent was less than 16 years old and could not be charged in any court for the offense of loitering for the purpose of engaging in prostitution. In addition, respondent had been “picked up at a pimp’s house” in March of 2010 along with another underage female, but she had been released without being charged.
According to the Assistant Corporation Counsel, respondent had agreed to assist the Queens County District Attorney in its prosecution of a pimp and in April 2010 she was meeting with an assistant district attorney about the case. At some point, respondent excused herself in order to go out to “buy clothing for her baby for Easter” and then go to meet with representatives of the GEMS program. Thereafter, respondent did not return to the District Attorney’s office, nor did she ever appear at the GEMS program and she was missing for several weeks thereafter. Based upon the information provided to the court, respon *966 dent’s detention was continued until May 25, 2010, for further proceedings upon the petition and the motions.[3]
II
Respondent’s motion for substitution of a PINS petition for the juvenile delinquency petition pending against her is made pursuant to Family Court Act § 311.4 (3). That portion of the juvenile delinquency statute reads as follows:
“In any proceeding under this article based upon an arrest for an act of prostitution, there is a presumption that the respondent meets the criteria for a certification as a victim of a severe form of trafficking as defined in section 7105 of title 22 of the United States Code (Trafficking Victims Protection Act of 2000). Upon the motion of the respondent, without the consent of the presentment agency, a petition alleging that the respondent is in need of supervision shall be substituted for the delinquency petition. If, however, the respondent is not a victim of a severe form of trafficking as defined by the federal Trafficking Victims Protection Act of 2000, or has been previously found under this article to have committed an offense pursuant to article two hundred thirty of the penal law, or has been previously adjudicated under section seven hundred fifty-two of this chapter and placed with a commissioner of social services pursuant to subdivisions (a) and (b) of section seven hundred fifty-six of this chapter, or expresses a current unwillingness to cooperate with specialized services for sexually exploited youth, continuing with the delinquency proceeding shall be within the court’s discretion. The necessary findings of fact to support the continuation of the delinquency proceeding shall be reduced to writing and made part of the court record. If, subsequent to issuance of a substitution order under this subdivision, the respondent is not in substantial compliance with a lawful order of the court, the court may, in its discretion, substitute a petition alleging that the respondent is a juvenile delinquent for the peti *967 tion alleging that the respondent is in need of supervision.”
Enacted as the “Safe Harbour for Exploited Children Act” in 2008 (L 2008, ch 569), the legislation created provisions authorizing, inter alia, the substitution of a PINS petition for a juvenile delinquency petition which charges a juvenile with committing an act which would constitute the crime of prostitution as defined by Penal Law § 230.00. The intent of the act is to “provide support and services to youth who are victims of sexual exploitation” (Assembly Mem in Support, Bill Jacket, L 2008, ch 569, at 13, 2008 McKinney’s Session Laws of NY, at 2243). In addition to adding subdivision (3) to Family Court Act § 311.4, the legislation amended article 7 of the Family Court Act (Family Ct Act § 712 [a]; § 732 [a]) and it added title 8-A to article 6 of the Social Services Law, which creates an extensive regime of services for children who are “sexually exploited” (Social Services Law § 447-a [1]; § 447-b).
As explained by the bill’s sponsor in the Assembly, the Safe Harbour for Exploited Children Act was motivated by a desire to create new policies for young children who are victimized by sexual exploitation. The memorandum in support states that
“[t]he overwhelming majority of these sexually exploited youth have a history of psychological, physical or sexual abuse as younger children and many have been raised amidst stark poverty and family dysfunction. Currently, the state’s response to this issue has been to prosecute sexually exploited youth as criminals. This response is ineffective as arresting, prosecuting and incarcerating victimized youth serves to re-traumatize them and to increase their feelings of low self-esteem. This only makes the process of recovery more difficult. Appropriate services [ ] for sexually exploited youth do not exist in the juvenile justice system and that both federal and international law recognize that sexually exploited youth are the victims of crime and should be treated as such. Therefore, sexually exploited youth should not be prosecuted under the penal law for acts of prostitution. Instead, services should be created to meet the needs of these youth outside of the justice system. Sexually exploited youth deserve the protection and services of the family court through processes in place for persons in need of supervision, including diversion, crisis intervention, *968 counseling, and emergency and long term housing services.” (Assembly Mem in Support, Bill Jacket, L 2008, ch 569, at 14, 2008 McKinney’s Session Laws of NY, at 2244-2245.)
To that end, Family Court Act § 311.4 (3) now contains specific provisions which authorize the substitution of a PINS petition for a juvenile delinquency petition charging a person between the ages of 7 and 16 with committing an act which would constitute the crime of prostitution under Penal Law § 230.00.[4] Where such a juvenile delinquency petition has been filed, “there is a presumption that the respondent meets the criteria for a certification as a victim of a severe form of trafficking as defined in section 7105 of title 22 of the United States Code (Trafficking Victims Protection Act of 2000).” (Family Ct Act § 311.4 [3].) Generally, a person under the age of 18 who is transported across state or international borders in order to compel the person to engage in commercial sex acts, or is under the age of 18 and assisting in the investigation and prosecution of those engaged in human trafficking, is “a victim of a severe form of trafficking” for purposes of the Trafficking Victims Protection Act (TVPA) (see 22 USC § 7102 [8]; § 7105 [b] [1] [C]; United States v Ramos-Ramos, 2007 WL 1582238, 2007 US Dist LEXIS 39455 [WD Mich 2007]).[5] Where there is no information to rebut the presumption for certification under the *969 TVPA, the Family Court must substitute a PINS petition for the juvenile delinquency petition, unless one of the specified statutory exceptions applies.
Here, there is no argument that the respondent is not eligible for certification as a victim of a severe form of trafficking under the federal statute, and that status is assumed for purposes of this motion. Based upon the presumption, respondent is entitled to the substitution of a PINS petition for the juvenile delinquency petition, whether or not the presentment agency consents, unless: (i) she has been previously adjudicated to be a juvenile delinquent by reason of the commission of an act which would constitute the crime of prostitution; (ii) she has previously been adjudicated to be a PINS and placed in the custody of the Commissioner of Social Services; or (iii) she expresses a current unwillingness to cooperate with specialized services for sexually exploited youth. If any of these exceptions is found to be applicable, the court has discretion to deny the substitution motion and to proceed upon the juvenile delinquency petition (Family Ct Act § 311.4 [3]).
The TVPA and the Safe Harbour for Exploited Children Act express the intentions of Congress and the New York Legislature to protect children from being exploited by those in the sex trade, and the New York statute expresses a preference that children who have been sexually exploited be spared criminal prosecution or adjudication under the juvenile delinquency statute in favor of receiving rehabilitative services.[6] Nevertheless, the exceptions in Family Court Act § 311.4 (3) make clear that *970 the right to seek a substitution of a PINS petition is not intended to provide automatic and complete immunity from prosecution. In that regard, it must be noted that a child who has previously been adjudicated to be a juvenile delinquent by reason of having committed an act constituting prostitution is ineligible, as is a child who has previously been adjudicated to be in need of supervision and who was placed in the custody of a commissioner of social services, regardless of the nature of the underlying PINS finding.
While respondent has no prior juvenile delinquency or PINS adjudications which would disqualify her from seeking relief under Family Court Act § 311.4 (3), this court has serious doubts as to respondent’s current willingness to accept and cooperate with specialized services for sexually exploited youth. While the statute does not define “specialized services for sexually exploited youth,” Social Services Law §§ 447-a and 447-b indicate that such services may include a “short-term safe house” which is
“a residential facility operated by an authorized agency . . . including a residential facility operating as part of an approved runaway program ... or a not-for-profit agency with experience in providing services to sexually exploited youth and approved in accordance with the regulations of the office of children and family services that provides emergency shelter, services and care to sexually exploited children including food, shelter, clothing, medical care, counseling and appropriate crisis intervention services” (Social Services Law § 447-a [2]).
Additionally, specialized services may include a “safe house” which is defined as
“a residential facility operated by an authorized agency . . . including a residential facility operating as part of an approved runaway program ... or a not-for-profit agency with experience in providing services to sexually exploited youth and approved in accordance with the regulations of the office of children and family services that provides shelter for sexually exploited children. A safe house created under this article shall provide or assist in securing necessary services for such sexually exploited chil *971 dren either through direct provision of services, or through written agreements with other community and public agencies for the provision of services including but not limited to housing, assessment, case management, medical care, legal, mental health and substance and alcohol abuse services. Where appropriate such safe house in accordance with a service plan for such sexually exploited child may also provide counseling and therapeutic services, educational services including life skills services and planning services to successfully transition residents back to the community” (Social Services Law § 447-a [4]).
Finally, a “community-based program” also qualifies as a specialized service for sexually exploited youth. A “community-based program” means “a program operated by a not-for-profit organization that provides services such as street outreach, voluntary drop-in services, peer counseling, individual counseling, family-therapy and referrals for services such as educational and vocational training and health care” (Social Services Law § 447-a [5]).
Although the respondent is merely 15V2 years old, she has suffered deprivation at the hands of her own parents who have previously neglected her and whose parental rights have long been terminated. Notwithstanding the demonstrated inability of her own parents to care for her, the State through its courts and public and private social service agencies has attempted to provide the respondent with stability and the necessities required to become a healthy and well-adjusted adult. However, there is no indication that these efforts have proved successful. According to the supervisor at New York Foundling, respondent has been involved in prostitution since the age of 12, and attempts to correct this self-destructive and dangerous behavior have failed. Respondent has regularly run away from her foster home for long periods of time when her whereabouts have been unknown to those charged with caring for her. She was arrested for loitering for the purpose of engaging in a prostitution offense on February 6, 2010, found in the home of a known pimp by police along with another underage female in March of 2010, and arrested for prostitution in April 2010,
According to Theresa Slater of New York Foundling, that agency had referred the respondent to the GEMS program, which is recognized as highly effective in addressing the needs of young women who are victims of sexual exploitation, but re *972 spondent ran from the program. Respondent has now given birth to her own child and despite efforts by social services officials to keep mother and child together, it appears that respondent has been unable or unwilling to properly care for her infant, leading to the removal of the child from respondent’s custody and to the institution of child protective proceedings against her. While respondent did offer to assist the District Attorney’s office in prosecuting her pimp, the extent and usefulness of that assistance is questionable as the respondent ultimately failed to cooperate with the prosecutor and she misled the Assistant District Attorney about her intention to visit with the GEMS program for the purpose of reentering their program.
While the law guardian argues that her client is currently willing to accept and cooperate with specialized services, that claimed willingness cannot be considered in vacuo. Rather, giving proper consideration to respondent’s extensive history, her behavioral pattern, her choice to engage in the “street life,” even at the cost of temporarily losing custody of her own infant child, and her demonstrated lack of sound judgment and maturity, the court finds that it would be unwise and inappropriate to simply substitute a PINS petition at this stage of the juvenile delinquency proceedings. Greater control over respondent’s movement and self-destructive behavior is required at this time, although with the provision of appropriate services in a controlled setting, an outcome other than an adjudication of juvenile delinquency may be appropriate at some later stage of the proceedings.
Accordingly, respondent’s motion for the substitution of a PINS petition for the juvenile delinquency petition is denied at this time for the reasons set forth herein.
This constitutes the court’s findings of fact and determination as required by Family Court Act § 311.4 (3).

. A “[plerson in need of supervision” is defined as
“[a] person less than eighteen years of age who does not attend school in accordance with the provisions of part one of article sixty-five of the education law or who is incorrigible, ungovernable or habitually disobedient and beyond the lawful control of a parent or other person legally responsible for such child’s care, or other lawful authority, or who violates the provisions of section 221.05, 230.00, or 240.37 of the penal law” (Family Ct Act § 712 [a]).

. A “Q]uvenile delinquent” is defined as
“a person over seven and less than sixteen years of age, who, having committed an act that would constitute a crime if committed by an adult, (a) is not criminally responsible for such conduct by reason of infancy, or (b) is the defendant in an action ordered removed from a criminal court to the family court pursuant to article seven hundred twenty-five of the criminal procedure law” (Family Ct Act § 301.2 [1]; see Matter of Raymond G., 93 NY2d 531, 535 [1999]).

. On May 25, 2010, the presentment agency filed a so-called “superseding petition” against the respondent (see Matter of Detrece H., 78 NY2d 107, 111 [1991]). This new petition contains the three crimes charged in the first petition and it adds a count charging respondent with committing an act which would constitute the crime of false personation (Penal Law § 190.23).

. While the substitution provision in Family Court Act § 311.4 (3) is limited to an arrest and Family Court proceeding based on “an act of prostitution,” the PINS statute was amended to include any child less than 18 years old who “has been the victim of sexual exploitation as defined in subdivision one of section four hundred forty-seven-a of the social services law” (Family Ct Act § 732 [a]). Social Services Law § 447-a (1) defines a “sexually exploited child” as any child under the age of 18 who: (i) is the victim of the crime of sex trafficking under Penal Law § 230.34; (ii) an abused child defined by Family Court Act § 1012 (e) (iii); (iii) a child who engages in acts constituting prostitution or loitering for the purpose of engaging in a prostitution offense; (iv) is the victim of the crime of compelling prostitution under Penal Law § 230.33; or (v) engages in a sexual or obscene sexual performance by a child under article 263 of the Penal Law. The divergence in definitions relates to the limitations relating to the Family Court’s juvenile delinquency jurisdiction (see Matter of Victor M., 9 NY3d 84, 87 [2007]; Matter of Kenny L., 50 AD3d 689, 690 [2008]; Matter of Iyona G., 60 AD3d 1403, 1404 [2009]), or owing to the child’s status as the victim rather than the perpetrator of the act in question.

. Congress enacted the TVPA on October 28, 2000 (see United States v Marcus, 560 US —, —, 130 S Ct 2159, 2163 [May 24, 2010]), and
“[t]he sex trafficking statute, captioned the Trafficking Victim’s Protection Act (TVPA), is a new effort to deal with a social ill whose international as well as interstate dimensions have invited *969 federal attention and action . . . The statute focuses on those (usually men) who make money out of selling the sexual services of human beings (usually women) they control and treat as their profit-producing property” (United States v Todd, 584 F3d 788, 789 [9th Cir 2009]).
The TVPA criminalizes and seeks to prevent human trafficking of women and children for exploitation in the sex trade (United States v Evans, 476 F3d 1176, 1179 [11th Cir 2007], cert denied 552 US 878 [2007]; see also Matthew Garber, Chapter 240: Human Trafficking — Combating the Underground Slave Industry in California, 37 McGeorge L Rev 190 [2006] [half of trafficking victims in California forced into sex trade]).

. The scope of the problem of juvenile prostitution should not be underestimated. One commentator notes that 16,000 juveniles are prostituted in Chicago each year (John Tanagho, Comment, New Illinois Legislation Combats Modern-Day Slavery: A Comparative Analysis of Illinois Anti-Trafficking Law with Its Federal and State Counterparts, 38 Loy U Chi LJ 895 [2007]). Indeed, in one New York case, the Appellate Division affirmed Family Court’s adjudication of a 12-year-old girl as a juvenile delinquent based upon the commission of the crime of prostitution, although the appellate court *970 directed that the juvenile be placed at a residential facility rather than with the Office of Children and Family Services (Matter of Nicolette R., 9 AD3d 270, 271 [2004], lv denied 3 NY3d 610 [2004]).